E-FILED
Thursday, 13 January, 2022 03:25:34 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JOSEPH GORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3176 |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[1] | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Joseph Gorman appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Gorman filed a Motion for Summary Judgment (d/e 12). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 17). This matter is before the Court for a Report and Recommendation. For the reasons set forth below, the Decision of the Commissioner should be AFFIRMED.

---

[1] The Court takes judicial notice that Kilolo Kijakazi is now Acting Commissioner of Social Security. As such, she is automatically substituted in as the Defendant in this case. Fed. R. Civ. P. 25(d).

## STATEMENT OF FACTS

### Background

Gorman was born on July 24, 1970.  He completed high school and lived in Pawnee, Illinois, about 20 miles south of Springfield, Illinois. Gorman previously worked as a maintenance mechanic/stationary engineer at an energy and power generating business.  He alleged that he became disabled on July 13, 2016 (Onset Date).  Gorman alleged that he suffered from several medically determinable impairments, including small fiber neuropathy, chronic kidney disease stage III, and status post kidney transplant.  Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), 15, 17, 47, 63, 225.

### Evidence Submitted Before the Evidentiary Hearing

On August 17, 2015, Gorman saw rheumatologist Dr. Jeffrey Horvath, M.D. for joint pain.  He also had tender, red nodules on his lower thigh and pain and paresthesia in his feet.  He then developed joint pain, stiffness, and swelling in the hands and wrists as well.  Gorman received a kidney transplant in 2004.  R. 517-18.  On examination, Gorman was alert, oriented, and in no acute distress.  He had multiple tender nodules on his thigh, synovitis in both wrists, swelling and tenderness in his ankles and heels, and bilateral foot tenderness and swelling. Straight leg testing was

negative and he had excellent range of motion throughout.  Dr. Horvath assessed polyarthritis, inflammatory; and erythema nodosum.  R. 519.  On the same day, Gorman saw dermatology physician's assistant Colleen Langer, PA-C, for a painful rash on his legs.  Langer took a sample for a biopsy.  R. 526.  A skin biopsy showed erythema nodusum.  R. 504.

On August 22, 2015, Gorman saw Dr. Arun Abraham, M.D.  He had red spots on his upper thighs.  R. 521.  On examination, Dr. Abraham noted multiple red, irregular tender lesions and assessed erythema nodosum.  Dr. Abraham advised Gorman to take NSAIDS and follow up with his primary care physician.  R. 522.

On September 14, 2015, Gorman's employer's disability insurer granted him short term disability income benefits beginning on August 27, 2015.  The short-term disability benefits were extended until December 28, 2015.  R. 1167-81.

On October 7, 2015, Gorman saw neurologist Dr. Koteswara Narla, M.D.  He reported fatigue, low back pain, numbness, tingling, weakness, and muscle spasms.  He had numbness and tingling in his feet extending up his legs and in his hands and he had some difficulty walking.  R. 490.  On examination, Gorman was alert, oriented, and in no acute distress.  The central nervous system examination was normal.  He had normal tone,

power, and reflexes in his extremities.  He had reduced pinprick sensation in his lower extremities up to the mid-thigh and in his upper extremities up to the upper arms.  He had normal vibration sensation and reduced temperature sensation in the feet and his coordination test was normal. Gorman could walk in tandem, on toes, and on heels.  Dr. Narla assessed possible small fiber peripheral neuropathy and ordered an EMG study of the upper and lower extremities to test for large fiber neuropathy.  R. 493.

On October 21, 2015, Dr. Narla performed an EMG/nerve conduction study of Gorman's upper and lower extremities.  The studies showed no abnormalities and  Dr. Narla recommended further testing for possible small fiber neuropathy as well as rheumatoid factors.  She also recommended MRIs of the brain and cervical spine.  R. 479.

On November 11, 2015, Gorman saw advanced practice nurse Kristina Waggoner, APN, in the offices of Gorman's primary care physician Dr. Christina Scheibler-Ventress, M.D.  R. 613-17.  He had been off work for three months due to generalized pain and neurologic symptoms. Gorman's feet and legs had numbness and tingling, he had intermittent upper extremity tremor and muscle spasticity, and he reported generalized weakness and worsening balance and coordination.  Waggoner noted that an MRI of his head and neck, and an EMG study of the upper and lower

extremities, were both negative.  Gorman had been started on gabapentin

for his pain.  He reported that his legs seemed a little better on the

medication, but his feet still bothered him, and he became easily fatigued.

R. 613.  On examination, Gorman was in no acute distress.  He had normal

gait and station, normal digits and nails, normal range of motion, and

normal muscle strength and tone.  He had a normal neurologic exam.

Waggoner referred Gorman to physical therapy for evaluation prior to

possible return to work.  R. 616.  Waggoner also recommended 30 minutes

of physical activity five days a week.  R. 617.

On December 18, 2015, Gorman saw advanced practice nurse

Waggoner.  He had completed six weeks of physical therapy and could

carry 35 pounds comfortably and could carry up to 50 pounds.  He had

decreased endurance.  The physical therapist stated that he could return to

work.  He reported continual pain with tingling/burning/cramping in his feet,

but the pain no longer radiated up his ankles.  He rated his pain at 1-2/10.

The pain increased to 3-4/10 with standing.  Gorman requested a second

opinion from a neurologist.  R. 809.  Waggoner's examination of Gorman

showed normal results.  R. 812.  Waggoner authorized return to work on

December 28, 2015 with a 35-pound lifting restriction.  R. 813.

On January 15, 2016, Gorman saw advanced practice nurse Waggoner for a follow up after returning to work. He reported that he was doing alright overall. His foot pain was increasing and his pain level increased to 3-4/10 by the end of the day. He also had tingling and burning in his feet that got worse during the workday and moved up to his knees. Prolonged standing accelerated the burning and tingling sensation. He was tired when he got home from work, but believed he could continue to work with current restrictions. Waggoner modified the work restrictions to a maximum lifting weight of 50 pounds and no overtime work. R. 805, 808.

On January 29, 2016, Gorman saw neurologist Dr. James Gilchrist, M.D. for a second opinion on paresthesia in both legs. Gorman reported that beginning in August 2015, he developed soreness in his feet, burning and tingling in his legs, and red bumps on his legs. Within a week, his wrists and hands started to swell. He was diagnosed with erythema nodosum and polyarthritis and a biopsy confirmed the erythema nodosum. He was treated and the red bumps and problems with his hands and wrists subsided. Gorman said that the burning, tingling, and pain in his lower extremities did not improve and also reported loss of strength and balance in his legs. He reported a mild, fine tremor in his hands, worse on the left, and memory loss and difficulty finding words. R. 872.

On examination, Gorman was in no acute distress.  He was fidgety and could not sit still and had some edema on his lower legs.  He was oriented, his speech was intact; his recent and remote memory was intact; and his concentration, attention span, and fund of knowledge was normal.  His facial sensation was intact; his sensory exam was normal; his coordination was normal; his gait was normal.  He had 5/5 strength in upper and lower extremities with intact tone and no muscle atrophy.  He had +3 reflexes bilaterally at the patella and ankle jerk.  R. 875.  The record is missing the last page of the treatment notes from this visit.  A second treatment note indicates that Gorman saw Dr. Gilchrist and Dr. James Tanner, M.D. for a consult on January 29, 2016. According to this second treatment note, Drs. Tanner and Gilchrist suspected Gorman had an autoimmune disease.  They recommended following up with a rheumatologist and a lumbar puncture was ordered.  R. 824. The lumbar puncture was performed on February 5, 2016.  R. 871.

On February 26, 2016, Gorman saw Dr. Scheibler-Ventress.  He reported right sided flank pain that was worse at the end of the day.  He rated the pain at 4-5/10 and said it interfered with falling asleep at night.  Dr. Scheibler-Ventress noted, "They have still never really figured out what is causing his nerve pain.  He is seeing Dr. Gilchrist now for a second

opinion." R. 800. On examination, Gorman was in no acute distress; he was tender along the suprapubic region and near his kidney transplant; he had no rash. Dr. Scheibler-Ventress ordered tests and increased the dosage of his gabapentin. R. 802.

On February 29, 2016, Gorman saw nephrologist Dr. Merry Downer, M.D., for management of kidney disease. Gorman reported that he was having severe and chronic pain in his lower extremities and feet. He cut his hours at work due to the pain and had problems standing for any period or walking for short distances. He also developed right-sided flank pain, which had improved over the last two to three days before the office visit. R. 472. Dr. Downer assessed chronic kidney disease with history of receiving a kidney transplant. Gorman's lab results showed improved kidney function and Dr. Downer stated that the right flank pain may have been musculoskeletal pain. She recommended taking NSAID pain relievers. R. 474.

On April 8, 2016, Gorman saw Dr. Scheibler-Ventress for a follow up of neuropathic pain. He had stopped taking gabapentin and said that his arms and legs were getting worse. Since he stopped taking gabapentin, his hands cramped with intricate work. Gorman rated his pain at 2-3/10 and worse at night. The burning in his legs came and went but was worse

at night.  Gorman said that he did not feel weak but felt tired.  R. 794.  On
examination, he "had a bit of a jerk" mainly in his upper extremities when
he sat on the examination table.  Gorman's abdomen was tender.  R. 797.

On July 12, 2016, Gorman saw Dr. Scheibler-Ventress for
neuropathy.  He felt that he was getting worse.  His feet were sore and
tingling and the sensation was moving into his hands and arms.  He had no
energy, was tired all the time, and nothing helped the burning and cramping
pain.  He planned to go to the Mayo Clinic for evaluation.  Dr. Scheibler-
Ventress noted that the neurologists and rheumatologists disagreed on the
source of the problem.  Gorman said that he was not sure if he could
continue working.  R. 785.  Dr. Scheibler-Ventress opined that they had
exhausted everything that could be done for him in Springfield, Illinois.  She
said she would await the evaluation from the Mayo Clinic.  She ordered him
off-work starting on July 13, 2016.  R. 788.

On July 12, 2016, Gorman's employer's disability insurer again
granted him short term disability income benefits beginning on July 18,
2016.  R. 1182.

On July 21, 2016, Gorman saw Dr. J.C. Tilburt, M.D., at the Mayo
Clinic, for a consultation.  He reported tingling, numbness, and cramping in
his feet, as well as twitches and handwriting problems.  His reported fatigue

had worsened over time and he also reported chronic neck and back pain.

R. 303.  On examination, Gorman had some diminished monofilament

sensation in his bilateral lower extremities.  He had symmetric strength and

reflexes bilaterally.  Dr. Tilburt referred Gorman for consultations with

neurology, nephrology, psychiatry, and chronic fatigue. R. 306.

On July 22, 2016, Gorman saw neurologist Dr. A.C. Adams, M.D. at

the Mayo Clinic.  Gorman reported cramping, burning, and tingling in his

hands and feet which had worsened over time.  Gorman's wife reported

memory problems and said that he may not remember what he had been

told from one moment to the next, and that he was moody and irritable.  He

had no difficulty managing financing or remembering to take medications,

working at his job, or engaging in other activities of daily living.   R. 307.

On examination, Gorman's mental status test was 35/38.  He had graded

response to pin and temperature sensation and mild vibratory loss.  The

rest of his neurologic exam was within normal limits.  R. 308.  Dr. Adams

concluded that Gorman's symptoms were most consistent with small fiber

neuropathy and canceled a thermoregulatory test that would have

confirmed the diagnosis because the test results would not alter

management of the problem.[2]  Dr. Adams suggested treatment with

---

[2] Gorman subsequently told Dr. Gilchrist that his insurance would not pay for the test.  R. 857.

increasing Gorman's gabapentin dosage as well as other treatment options of pregabalin, nortriptyline, and duloxetine (Cymbalta).  Dr. Adams also recommended a medicated topical cream and found that Gorman's cognitive status was normal.  He said that the memory problems may come from distraction and pain and opined that Gorman's tremor was medication induced.  R. 308-09.

On July 28, 2016, Gorman saw psychiatrist Dr. T.A. Rummans, M.D. at the Mayo Clinic.  His worsening medical problems were making him anxious and depressed and he rated his quality of life at 7/10.  He felt mild anxiety more than depression.  He denied significant anxiety or dysphoria, mood swings, panic attacks, psychotic symptoms or suicidal thoughts or plans.  R. 319.  On examination, Gorman's mood was euthymic but mildly anxious; his affect was congruent; he had good eye contact and normal speech; his thought processes were linear and goal directed; his insight and judgment were good; and his gait was normal.  Dr. Rummans diagnosed anxiety secondary to medical conditions and mild cognitive changes.  Dr. Rummans recommended neuropsychological testing to determine whether Gorman had any mild cognitive changes.  R. 322.

On July 29, 2016, Gorman saw nephrologist Dr. Carrie A. Schinstock, M.D., at the Mayo Clinic.  Gorman's wife reported that for the last couple of

years he had a temperature in the 99-to-100-degree range.  Gorman

reported being very fatigued, occasional shortness of breath but no chest

pain, and diarrhea a few days a week since the transplant.  R. 327.  On

examination, he was alert, oriented, and in no acute distress; his lower

extremities had trace bilateral edema; he had decreased sensation on his

feet; and his gait was normal.  R. 328.  Dr. Schinstock found that Gorman's

kidney function was stable.  She said he could tolerate the medications

listed by Dr. Adams, but he should start with the lowest possible dose.  She

said he may be more susceptible to side effects.  R. 328.  Gorman returned

to his home in Pawnee, Illinois, after completing the consultation at the

Mayo Clinic.

On September 14, 2016, Gorman saw Dr. Downer.  Gorman reported

that the Cymbalta caused lightheadedness and dizziness.  R. 454.  Dr.

Downer told him to contact his primary care physician Dr. Scheibler-

Ventress.  R. 458.

On September 16, 2016, Gorman saw advanced practice nurse

Waggoner in Dr. Scheibler-Ventress' office.  Gorman reported improved

upper and lower extremity paresthesia and denied upper extremity pain or

weakness.  His lower extremity pain was stable; he reported some muscle

twitching; he reported his medication made him more fatigued and

lightheaded.  R. 771.  On examination, Gorman had a lump on his left foot and swelling in his left small toe. The left foot was mildly tender to touch. Waggoner decreased the dosage of Cymbalta and added amitriptyline.  R. 774-75.

On September 21, 2016, Gorman saw psychiatrist Dr. Sankrant Reddy, M.D.  On examination, Gorman was oriented and in no acute distress; his mood was anxious and depressed; his affect was full and calm; he had normal eye contact, speech, psychomotor, thought content, concentration, recent and remote memory, gait, and station; his thought process was linear; his associations were intact; and he denied suicidal and homicidal ideations.  R. 600.  Dr. Reddy assessed an adjustment disorder with anxiety/depression.  R. 601.  Dr. Reddy recommended adjusting Gorman's medications and starting psychotherapy, and encouraged Gorman to exercise.  R. 601.

On October 24, 2016, Gorman saw Rajagopal Sreedhar, M.D., for sleep apnea.  Gorman had been diagnosed with sleep apnea and narcolepsy with cataplexy.  He reported that his narcolepsy was well controlled with medication and he was able to do some of his activities without much problem.  Gorman was not able to use a CPAP because of

claustrophobia and mask leaks.  R. 862.  Dr. Sreedhar prescribed an oral

appliance to wear at night while sleeping for sleep apnea.  R. 865.

From November 1 to November 7, 2016, Gorman exchanged

messages with advanced practice nurse Waggoner.  He complained that

his legs were swelling from taking Lyrica and asked if he could try

nortriptyline.  Waggoner changed Gorman's medicine to nortriptyline and

gabapentin.  Gorman also reported that he did not think he could return to

work and stated that he was doing yard work and home maintenance for a

maximum of an hour or two a day to keep himself in better shape.  He

stated that unlike work, he did not need to maintain a set pace or do things

he did not feel like doing.  R. 761-62.

On November 18, 2016, Gorman saw Dr. Gilchrist.  Dr. Gilchrist

reviewed the notes from Gorman's visit to the Mayo Clinic.  He had never

had a biopsy to confirm small fiber neuropathy and still reported pain in his

feet. R. 857.  On examination, Gorman was in no acute distress; he had

edema on his mid shin; his feet were tender to palpation; his sensory exam

was normal; his coordination was normal; he had a normal gait, 5/5

strength, intact tone, and no muscle atrophy.  He had hyperactive reflexes

bilaterally at the patella and ankle jerk; he was alert and oriented; he had

intact speech and intact recent and remote memory; his concentration,

attention span, and fund of knowledge were normal.  R. 860.  Dr. Gilchrist

assessed small fiber neuropathy, paresthesia, and neuropathic pain in his

legs.  The cause for the neuropathy had not been determined.  Dr. Gilchrist

noted that the various medications Gorman took for his neuropathy pain

had "generally dismal effects" on Gorman's symptoms.  Dr. Gilchrist

recommended slowly increasing the dosages of gabapentin and

nortriptyline and also recommended over-the-counter topical ointments with

lidocaine and capsaicin.  R. 861.

On December 20, 2016, Gorman saw Dr. Reddy.  He reported feeling

tired and sore.  He said the nortriptyline caused leg swelling and he still had

pain.  He felt depressed, but not anxious.  On examination, Gorman was

alert, oriented, and in no acute distress; his mood was irritable and his

affect was restricted; he had normal eye contact, psychomotor, thought

content, concentration, gait, and station; his speech was regular; he had no

suicidal or homicidal ideations; he had good judgment and insight; and he

had intact recent and remote memory.  Dr. Reddy stated that Gorman had

mild anxiety and depression due to his "neuropathy/medical issues."  R.

596.

On January 3, 2017, Gorman saw Dr. Scheibler-Ventress.  He was

taking gabapentin only and also used a topical capsaicin cream.  He rated

his pain at 8-9/10 at its worse; he wore compression stockings; he had tightness in his chest; his swelling was getting worse; his erythema nodosum was coming back.  R. 749.  On examination, he was in no acute distress.  Dr. Scheibler-Ventress noted a small murmur in his heart to auscultation.  He had edema in his lower extremities, left greater than right, and some firmness in his abdomen.  Dr. Scheibler-Ventress started Gorman on Lasix and Wellbutrin and ordered a CT scan of his abdomen and pelvis.  R. 753.  The CT scan showed a moderate to large pericardial effusion that had increased in size since 2012 and some edema and pleural effusion on the abdomen, pelvis, and thighs.  R. 680-81.

On January 12, 2017, Gorman saw cardiac specialist Dr. Stephen Hazelrigg, M.D., for pericardial effusion.  Gorman had pericardial effusion for several years, but the effusion had increased in size.  He complained of fatigue and some shortness of breath.  He had an 18-pound weight gain, believed to be retained fluid.  R. 852.  On examination, Gorman had regular heart sounds, but heart tones were muffled; he had full range of motion in all joints and 5/5 strength throughout; he was alert with normal mood, affect, attention span, and concentration.  Dr. Hazelrigg assessed a pericardial effusion and a small right pleural effusion.  He planned a

thoracoscopic surgery to drain fluid collections and perform a pericardiectomy.  R. 856.

On January 17, 2017, the disability insurer of Gorman's former employer started paying Gorman long term disability benefits.  The insurer determined that Gorman could not return to his prior work as a maintenance mechanic.  R. 1202.

On January 18, 2017, Dr. Hazelrigg performed the planned surgery to relieve the pericardial effusion.  R. 849.

On January 26, 2017, Gorman saw Dr. Scheibler-Ventress.  He was down 15 pounds after the surgery.  R. 743.  On examination, Dr. Scheibler-Ventress noted decreased breath sounds in the right lower lung.  The examination of his extremities for edema was normal.  R. 746.  Dr. Scheibler-Ventress increased the gabapentin dosage.  R. 747.

On February 13, 2017, Gorman saw Dr. Hazelrigg for a postoperative follow up.  He had done well since the surgery and felt more energetic, and his pedal edema had resolved.  The pathology examination did not show significant findings on the pericardium.  R. 851.

On February 15, 2017, Gorman saw Dr. Downer.  He reported that he felt much better.  He was not short of breath and his leg swelling had markedly decreased.  He said that he did not need to use his CPAP

machine anymore.  His abdominal distention had improved but was not gone and he had some intermittent chest pain that lasted for a few minutes each time.  R. 417.  On examination, Gorman had no peripheral edema. Dr. Downer also noted that Gorman's polyneuropathy was so debilitating that he could not work.  Gorman reported that it was extremely difficult for him to stand or walk.  She told him to avoid NSAIDs and Cox 2 inhibitor pain medicines due to his kidney condition.  R. 420.

On March 20, 2017, Gorman saw Dr. Reddy.  He reported no changes and said that his anxiety and depression were stable.  His energy and motivation were fair and he tolerated his medications and denied any side effects.  On examination, Gorman was alert, oriented, and in no acute distress; his mood was good, and his affect was calm and full; his eye contact, speech, psychomotor, thought content, concentration, recent and remote memory, gait, and station were all normal; his thought process was linear; his associations were intact; and he had no suicidal or homicidal ideations.  His insight and judgment were good.  R. 592.  Dr. Reddy assessed adjustment disorder with anxiety/depression, insomnia.  R. 593.

On April 17, 2017, Gorman saw podiatrist Dr. Mary Sipes, DPM.  Dr. Sipes had removed a cyst from Gorman's left foot three to four months earlier.  He reported no pain at the site of the cyst removal, but said his feet

hurt all the time due to neuropathy.  R. 399.  Her examination showed no recurrence of the cyst.  R. 400.

On May 8, 2017, Gorman saw Dr. Scheibler-Ventress.  Gorman reported that his hands and feet were getting worse.  He had daily pain and he rated the pain at 3/10 and said the pain in his hands and feet was constant, and the pain in his feet was worse when he stood.  He could not stand for extended periods.  His breathing was back to normal, and his swelling was almost gone.  He said he could not write anymore.  It took five minutes to write a check.  R. 726.  Dr. Scheibler-Ventress noted no edema on examination and increased the gabapentin dosage.  R. 730.

On July 11, 2017, Gorman completed a Function Report – Adult form. R. 237-44.  Gorman lived in a house with family.  He reported pain in his feet when standing, kneeling, or walking; swelling in his feet when standing or sitting; pain and cramping in his hands that limited his ability to write or use tools; and fatigue and tiredness.  R. 237.  In a typical day, Gorman got up in the morning, fed his dogs, ate breakfast, made phone calls and ran errands.  He then ate lunch and thereafter did chores.  He gave examples of mowing grass using a zero-turn radius riding lawn mower, washing dishes, and doing laundry and estimated that he spent an hour and a half a day on the chores.  He did one chore per day and did not need

encouragement to perform his chores.  Gorman made his own meals.  He listed examples of cereal, eggs, toast, sandwiches, frozen pizza, and leftovers of meals his wife made and said it took up to 20 minutes a day to prepare meals.  R. 239.  He had difficulty sleeping due to narcolepsy and sleep apnea.  R. 238, 239.

Gorman reported problems with his self-care.  He rested after dressing, apparently due to difficulty putting on compression socks, and his feet hurt while standing in the shower.  He kept his hair short and shaved once a week.  He reported spending up to 30 minutes on the toilet due to constipation and diarrhea. He did not need reminders to perform self-care or to take medicine.  R. 238-39.

Gorman went outdoors multiple times a day and he sometimes sat on his porch during the day.  He went out alone and he both drove and rode in a car.  He shopped for groceries and household items once or twice a week.  Shopping trips generally took less than an hour.  Gorman could pay bills, count change, and handle his own bank accounts; however, he reported some difficulty performing these activities because "writing depends on how shaky my hands are."  R. 240.

Gorman reported that his hobbies were watching television, going to movies, camping, and walking/hiking, but stated he walked or hiked very

short distances.  He used to ride a motorcycle but quit engaging in that activity.  He regularly went camping and to the theater with his wife when his wife reminded him that they needed to go do something.  He did not visit with friends or family much.  R. 241-42.

Gorman opined that his impairments limited his ability to lift, squat, stand, walk, sit, kneel, climb stairs, and use his hands.  He could walk for half a mile before needing to rest for 15 to 20 minutes.  He could pay attention for up to two hours, but he did not finish what he started.  He could follow written instructions, and he could follow simple spoken instructions and he got along with authority figures.  Stress caused him to get angry and upset more easily.  He could handle changes in routine if he knew about the changes in advance.  R. 243.  Gorman did not know which medications caused any side effects.  He states, "I take enough different medicines that I don't know which meds cause what."  R. 244.

On July 24, 2017, Gorman saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  Gorman reported that he had small fiber neuropathy, narcolepsy, sleep apnea, high blood pressure, status post kidney transplant, anemia, status post pericardial effusion, leg edema, fatigue, inflammatory polyarthritis, fibromyalgia, and osteoporosis. He used a mouthpiece during sleep for the sleep apnea, and he took

medication for the narcolepsy.  He reported pain, tingling, and burning in his hands and feet.  R. 1029.  On examination, Gorman was able to bear weight and ambulate without ambulatory aids; he was oriented, answered questions appropriately, and was in good contact with reality; he had edema of the legs and hyperactive peripheral pulse at 3+; he had decreased pinprick sensation in both feet; he had no evidence of joint redness, heat, swelling, or thickening; he had no evidence of paravertebral muscle spasms.  His hand grip was 5/5, and he could perform fine and gross manipulations bilaterally; his lumbosacral spine flexion was normal; straight leg raising tests were normal; and he had full range of motions in his joints.  Gorman had no specific trigger points.  R. 1030-31.

On July 31, 2017, state agency physician Dr. Richard Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment of Gorman. Dr. Bilinsky opined that Gorman could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps; never climb ladders, ropes, or scaffolds.  Dr. Bilinsky also opined that Gorman should avoid even moderate exposure to hazards.  Dr. Bilinsky found that Gorman had no other function limitations due to his medical impairments.  R. 104-06.

On August 1, 2017, Gorman saw dermatologist Dr. Judith Knox, M.D. On examination, Gorman was in no acute distress; he was oriented and not unduly anxious. Dr. Knox noted erythematous papules and pustules on his back and verrucoid papules over the left foot. Gorman had no peripheral induration or erythema and no lesions suspicious for cancer. Dr. Knox assessed warts and actinic keratoses. She advised Gorman to avoid having skin exposed to the sun and to use sunscreen and treated Gorman's affected areas with liquid nitrogen. R. 981.

On August 11, 2017, Gorman saw Dr. Scheibler-Ventress. He was lightheaded at times, usually when moving and his energy level was low. He was sleeping well, but he reported continued chronic pain and he could not stand for prolonged periods. Dr. Scheibler-Ventress quoted Dr. Gilchrist as stating that "the best we will likely get is 30% improvement with this pain with what we have." R. 903. On examination, Gorman had a tremor in his left hand. R. 907. Dr. Scheibler-Ventress increased his gabapentin dosage. Regular exercise was encouraged. R. 907.

On August 16, 2017, Gorman saw Dr. Downer. Gorman's laboratory results showed stable kidney function. Dr. Downer continued Gorman's kidney medications. Dr. Downer, however, started to wean Gorman off a blood pressure medication and substitute a different medication if

necessary.  Gorman reported chronic pain in his feet and that he could not stand for any length of time, and the pain worsened with activity.  Gorman also reported chronic fatigue.  Two neurologists told him the fatigue was secondary to the neuropathy.  R. 973.

On August 17, 2017, Gorman called Dr. Scheibler-Ventress' office. He reported that he got dizzy when he increased his gabapentin dosage. He decreased the dosage and the dizziness subsided after a couple of days.  R. 902.

On September 14, 2017, Gorman called Dr. Scheibler-Ventress' office.  Gorman was not sure the nortriptyline was helping.  Reducing the gabapentin dosage made his side effects "a lot better."  R. 901.

On September 27, 2017, Gorman saw cardiology specialist Dr. Saurabh Jha, M.D.  Gorman denied any recurrence of chest discomfort or shortness of breath after the pericardiectomy.  He had occasional lightheadedness.  An echocardiogram showed normal left ventricle function and no evidence of pericardial effusion.  R. 1000.  The physical examination was normal with no significant edema in his lower extremities. R. 1003-04.

On October 10, 2017, Gorman saw Dr. Scheibler-Ventress.  Gorman felt worse and got dizzy from increased dosage of gabapentin.  The

nortriptyline may have helped with his tingling.  Gorman said he was the same overall.  He reported tremors in both hands and that he could not write at times.  The tremors were intermittent, but more noticeable over time.  R. 895.  On examination, he was in no acute distress.  He had significant tremors of both hands.  Dr. Scheibler-Ventress assessed fatigue and small fiber neuropathy.  She increased the nortriptyline, decreased the gabapentin dosage, and referred Gorman to Dr. Gilchrist.  She ordered that he continue on disability with his employer.  R. 899.

On October 13, 2017, Gorman saw Dr. Gilchrist and neurology resident Dr. Nidaullah Mian, M.D.  Gorman reported that his paresthesia was extending up to his knees and mid thighs.  He believed he was getting weaker and topical lidocaine helped for about an hour.  Dr. Gilchrist noted that EMG/nerve conduction studies did not reveal any sign of carpal tunnel syndrome.  R. 936. On examination, Gorman was in no acute distress and had no peripheral edema.  He could recall only one of three words after five minutes; his language, speech, fund of knowledge, and concentration were intact; his sensation to touch, pin prick, and vibration were intact; proprioception in the toes was intact; his coordination was normal, and his reflexes were symmetric.  His gait was normal, and his strength was 5/5; he had intact muscle tone and no muscle atrophy in his extremities.  Dr.

Gilchrist assessed small fiber neuropathy and proposed increasing the dose of nortriptyline from 75 mg to 100 mg to see if Gorman could tolerate it.  Dr. Gilchrist, however, did not change the prescription for nortriptyline at this time.  Dr. Gilchrist noted, "Should this fail to provide any benefits, we will have exhausted those medicines with good evidence of benefit at this point."  Dr. Gilchrist noted that Gorman could possibly try Topamax or antiepileptic medications such as Tegretol.  R. 940.

On November 1, 2017, Dr. Scheibler-Ventress completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  R. 942-47.  Dr. Scheibler-Ventress opined that Gorman could occasionally lift and carry 20 pounds and never lift or carry more than 20 pounds.  She said the Gorman could sit for six hours without interruption in an eight-hour workday and could both stand for one hour and walk for one hour each day without interruption.  She said he could sit for a total of six hours in an eight-hour workday and could both stand and walk for one hour each in an eight-hour workday.  Dr. Scheibler-Ventress explained:

> Patient had debilitating neuropathy and prolonged standing/walking exacerbate his symptoms.  Sometimes @ rest his symptoms will flare and he may need to Δ positions => prolonged stand = walk> sit in regards to ↑ his symptoms.

R. 943.  She said Gorman did not need a cane to ambulate.  R. 943.  In response to a request on the form to identify medical or clinical findings to

support her assessment, Dr. Scheibler-Ventress said, "Patient sees neuro. Has had EMG. Has been evaluated @ Mayo."  R. 943.

Dr. Scheibler-Ventress opined that Gorman could occasionally reach, handle, finger, feel, and push/pull bilaterally.  She said to "See previous" for the medical or clinical findings that supported her assessment.  R. 944. She said Gorman could occasionally operate foot controls bilaterally.  She said that Gorman's symptoms affected his bilateral upper and lower extremities.  R. 944.  She opined that Gorman could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps; and could never climb ladders or scaffolds.  She said the "see previous" for the medical or clinical findings that supported her assessment.  R. 945.  She said Gorman could occasionally be exposed to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibration.  He also could occasionally operate a motor vehicle.  She said he had these limitations because he "has idiopathic neuropathy."  R. 946.  She opined that Gorman could not travel without a companion and he could not walk a block at a reasonable pace on rough or uneven surfaces.  She identified the medical findings that supported this opinion as, "Long distance stand or walking or climbing is difficult."  R. 947.

On December 9, 2017, Gorman saw physician's assistant Todd Peterson, PA-C, at the Veteran's Administration (VA) outpatient clinic for an initial medical exam.  Gorman wanted his lab work and prescriptions filled through the VA.  R. 1256-57.  He denied having headaches, chest pain, shortness of breath, or problems with his bowels at the time of the examination.  On examination, he was alert and with no acute distress; he had mild nonpitting edema on his bilateral lower extremities; he had full range of motion.  R. 1258.

On January 4, 2018, Gorman saw VA psychiatrist Dr. Jonathan D. Colen, D.O., for a psychiatry consult to establish care.  Dr. Colen reviewed Gorman's records and noted a history of anxiety and depression secondary to chronic medical conditions.  Gorman denied any suicidal or homicidal ideations.  He also denied difficulty with sleep or appetite "for the most part."  He wanted to talk to a therapist but did not want psychotropic medications.  R. 1251-52.  On examination, he was appropriately dressed, cooperative, and pleasant; he made good eye contact and had normal speech; he had normal gait and station.  Dr. Colen noted a mild bilateral hand tremor.  Gorman's mood was reported at "reasonably good," and his affect was congruent; his form of thought was linear, logical, and goal oriented and free of delusions; he had no gross deficits in memory or

cognition; he had average intelligence and his insight and judgment were intact.  Dr. Colen assessed adjustment disorder with mixed depressed and anxious mood and anxiety and depression secondary to general medical condition.  Dr. Colen prescribed supportive psychotherapy.  R. 1253.

On January 16, 2018, Gorman saw state agency psychologist Dr. Dolores Trello, Psy.D., for a mental status examination.  Gorman described his physical impairments.  He was on disability from work.  He said, "I went from $100,000 a year job down to nothing.  I would get 10 holidays a year, and I had good medical insurance.  Now I have chronic pain, depression, and anxiety."  Gorman had a couple of friends and he enjoyed camping and watching television.  He could cook and do self-care; he did laundry and swept; he shopped for groceries.  He reported that his concentration was poor, and he had memory problems.  R. 1020-21.  On examination, he had a normal affect; he was oriented with no evidence of hallucinations, delusions, thought disorder, or psychosis; his memory was intact; he was well-informed; he could perform simple mathematical problems; and he provided abstract meaning to proverbs.  Dr. Trello assessed generalized anxiety disorder and depressed mood associated with his physical impairments.  R. 1021-22.

On January 24, 2018, Gorman saw VA counselor Betsy Van Brocklin, LCSW, for psychotherapy.  Van Brocklin diagnosed mood disorder due to medical condition with depressive features.  Gorman reported that his life was a "train wreck" due to his medical conditions and inability to work.  Van Brocklin explored ways to manage his mood.  Gorman reported that he enjoyed camping and reading.  On examination, he was alert and oriented with good eye contact; his mood and affect were congruent to the topic; his memory appeared to be intact; he had no cognitive deficits; he denied homicidal or suicidal ideations and had no hallucinations or delusions.  R. 1250.

On January 30, 2018, Gorman saw Dr. Sipes for swollen toes on his left foot.  On examination, he had normal muscle tone, no tremors in any extremity, and a normal gait.  He had bilateral edema on his lower extremities and the base of his left second and fourth toe were bulbous and tender.  The left fourth toe had a palpable nodule and/or cyst on its base.  Dr. Sipes assessed left foot pain and recommended an MRI.  R. 1159-60.

On February 1, 2018, Gorman saw Dr. Scheibler-Ventress.  R. 1060-65.  Gorman felt a little better and he tolerated the 75 mg dose of nortriptyline.  He got a little lightheaded but not as bad.  He reported no chest pain or shortness of breath.  He had swelling in his left hand and left

lower extremity.  He rated his pain at 4/10 on average and it increased with activity.  R. 1060.  Gorman's examination was normal.  Dr. Scheibler-Ventress increased the nortriptyline dose from 75 mg to 100 mg.  R. 1064-65.  An MRI of Gorman's left foot on February 2, 2018, showed non-specific soft tissue swelling in the dorsum of the foot extending to the toes with no evidence of osteomyelitis.  R. 1115.

On February 15, 2018, state agency physician Dr. Charles Kenney, M.D., prepared a Physical Residual Functional Capacity Assessment of Gorman.  Dr. Kenney agreed with Dr. Bilinsky's July 31, 2017 assessment except Dr. Kenney opined that Gorman was further limited to occasional fine and gross manipulations bilaterally.  R. 118-21.

On February 16, 2018, Gorman saw his transplant nephrologist Dr. Bradford West, M.D.  R. 1158.  Gorman had stage III kidney disease.  On examination, he did not have any suspicious skin lesions and was alert and oriented.  Gorman reported episodes of dizziness with low blood pressure and increased heart rate.  He said the symptoms spontaneously resolved without stopping movement.  R. 1158.  Dr. West noted some evidence of antibody rejection of the transplanted kidney.  Gorman reported that he tolerated his transplant medications well without any diarrhea, tremors, or headaches.  R. 1154.

3:20-cv-03176-SEM-TSH    # 18    Filed: 01/13/22    Page 32 of 50

On March 29, 2018, Gorman had a transthoracic echocardiogram. The test showed normal left ventricle ejection fraction of 66 percent, moderately increased right ventricle wall thickness, low normal right ventricle systolic function, moderate concentric left ventricular hypertrophy, and impaired left ventricle relaxation.  R. 1146.

On May 11, 2018, Gorman saw Dr. Gilchrist.  He could not tolerate higher doses of nortriptyline because the higher doses caused constipation. R. 1041.  On examination, Gorman was in no acute distress; he had decreased touch sensation above the ankles and decreased pinprick sensation below the ankle on the left; pinprick sensation on the right was intact; he had intact proprioception in the toes; his reflexes were symmetric; he had 5/5 strength in all extremities with intact tone and no muscle atrophy and his gait was normal.  Dr. Gilchrist noted that Gorman did not get significant pain relief from his medication, but he could not tolerate higher doses of the medication.  Dr. Gilchrist said he would check to see if Gorman would qualify to participate in some clinical trial for neuropathic pain.  He also discussed trying Topamax or Tegretol in the future. R. 1045.

On May 29, 2018, Gorman saw Dr. Sailaja Cheruku M.D., for chronic diarrhea.  Gorman said he moved his bowels three to six times a day.  He

Page **32** of **50**

had a history of chronic diarrhea and it was getting worse.  Dr. Cheruku said the diarrhea may come from irritable bowel syndrome or may be medication induced.  Dr. Cheruku noted a prior workup for diarrhea was negative and prescribed medication for the diarrhea.  R. 1140.

On July 20, 2018, Dr. Scheibler-Ventress completed a form for the disability insurance carrier for Gorman's prior employer.  Dr. Scheibler-Ventress opined that Gorman was unable to work in any capacity due to idiopathic peripheral neuropathy.  She stated that his condition was lifelong and that his treatment regimen had been optimized.  She said that no accommodations would increase his capacity to work.  R. 1027.

On August 13, 2018, Gorman saw Dr. Knox.  On examination, Gorman had inflammatory papules over his face, erythematous scaling over his face, multiple hypopigmented scars on his neck, chest, and arms, and erythema and maceration over his groin and inguinal folds.  R. 1136.  Dr. Knox assessed actinic keratoses and treated lesions with liquid nitrogen.  R. 1135.

On September 7, 2018, Gorman saw Dr. Gilchrist.  Dr. Gilchrist noted that four months earlier in May 2018 a trial of taking higher doses of nortriptyline failed.  Dr. Gilchrist noted that Gorman did not participate in the clinical trials mentioned in the May 2018 examination note.  Dr. Gilchrist

further noted that Gorman did not qualify for one clinical trial and a second trial was essentially the same as the one for which he did not qualify. The third proposed trial did not occur. R. 1035. Dr. Gilchrist tapered Gorman off of nortriptyline over two weeks. If Gorman was worse in two weeks, he would add lamotrigine (Lamictal). R. 1039.

On September 13, 2018, Gorman saw Dr. Jha. Dr. Jha noted trace bilateral pretibial and ankle edema on examination. R. 1125. Dr. Jha recommended compression socks for leg edema and continued his blood pressure monitoring at home. R. 1126.

On October 31, 2018, Gorman saw Dr. Scheibler-Ventress. He was still seeing Dr. Gilchrist for small fiber neuropathy. Gorman reported no change in his neuropathy and he did not tolerate attempts to change his medications. He reported no shortness of breath, but said that he still got lightheaded. He rated his pain at 3-4/10 at rest and 6-7/10 during activities of daily living. He still had tremors in his hands and difficulty with fine motor. He bought a wheelchair so he could go more places as he could not stand or walk for too long and he still had some swelling. R. 1241. On examination, Gorman was in no acute distress. His left lower extremities had edema around the ankle and shin. The rest of the exam was unremarkable. R. 1245.

On November 9, 2018, Gorman saw Dr. Gilchrist.  Dr. Gilchrist noted that after two weeks on lamotrigine, Gorman experienced headaches and worse neuropathic pain.  Dr. Gilchrist stopped the lamotrigine and restarted the nortriptyline.  Gorman returned to his baseline before the trial with lamotrigine.  He continued to take gabapentin throughout.  At this visit, Gorman reported that his pain was at his baseline.  He rated the pain at 2/10.  The pain increased if he worked more.  Gorman wanted to continue his current regimen.  R. 1211.

On examination, Gorman was in no acute distress; he had intact proprioception in his toes, and decreased sensation to touch near his ankles bilaterally and also higher up on the left; he had a normal gait and 5/5 strength in his neck and extremities.  Dr. Gilchrist continued Gorman's medications.  R. 1215.  Dr. Gilchrist stated that Gorman felt that his neuropathy was adequately maintained on his medication and by "minimizing tasks that induce" neuropathic pain.  He could not try other options because of his kidney disease.  R. 1215.

On December 20, 2018, Gorman's employer's disability insurer extended Gorman's long term disability income benefits past January 8, 2019, because the insurer determined that due to Gorman's impairments, he could not be gainfully employed in another job that would pay him 66 2/3

percent of his pre-disability salary.  The insurer noted that Gorman had

applied for Disability Benefits, and if the Defendant awarded Disability

Benefits to Gorman, the insurer would reduce his long-term disability

benefits under the employer's policy by the amount of the Disability

Benefits award.  R. 1206-08.

### The Evidentiary Hearing

On April 1, 2019, the Administrative Law Judge (ALJ) conducted an

evidentiary hearing.  Gorman appeared in person and with his attorney.

Vocational expert Bob Hammond also appeared.  R. 57.

Gorman testified first.  He graduated from high school and was in the

Navy from 1988 to 1992.  R. 60-63.  Beginning in 2000, he worked a

mechanical maintenance job at a power plant.  He worked at the power

plant from 2000 until his Onset Date.  R. 63.  Gorman said that he was

diagnosed with neuropathy by Dr. Narla in 2015.  Gorman agreed with the

ALJ that he was diagnosed with small fiber neuropathy based on his clinical

presentation.  R. 67-68.

Gorman said he could not work primarily because of his neuropathy.

R. 69.  Before the Onset Date, the neuropathy caused problems at work.

He had pain when standing and pain in his hands and lifting bothered him.

He had problems climbing ladders at work, he dropped objects such as car

keys and wrenches, and his hands cramped up and locked occasionally and unpredictably.  R. 73.  Gorman's neuropathy's symptoms got worse after he stopped working.  R. 74.

Gorman's kidney condition limited the medicines he could take for his neuropathy.  The medicines he took for neuropathy helped but "they're not solving the problem."  R. 74.  He took hydrocodone sparingly for pain and tried to limit himself to 30 hydrocodone pills a year.  He took them when he could not sleep due to the pain, two to three times a month.  R. 76.

Gorman said that his hand shook and the shaking became worse the more he used his hands.  As a result, he had problems turning pages, typing, and writing.  He also had problems dropping objects.  He had reduced sense of feeling in his hands and he had trouble distinguishing between cold and wet laundry.  He could button a shirt, but he took a long time to do it.  R. 76-78.

Gorman also had problems with fatigue.  He had more problems with his hands when he was fatigued.  His legs also became weak, and his feet got "tired."  He sometimes became lightheaded, however he has not fallen. R. 78-79.

Gorman could drive and he drove to the hearing.  Gorman estimated that he drove less than 100 miles a week.  He lived about 20 miles from Springfield and he drove to Springfield about twice a week.  R. 71.

Gorman said he had problems with diarrhea and constipation and attributed the problem to his medications.  He had diarrhea two to three times a week and went to the bathroom six to seven times a day when he had diarrhea.  R. 82-83.

Gorman opined that he could stand for 15 minutes and walk for 15 minutes.  R. 75.  Gorman said he could lift less than 10 pounds on a regular basis.  He said he could lift a 20-pound bag of dog food on occasion.  R.  83-84.  Gorman said he could sit for a couple of hours at a time.  R. 86.  His legs swelled if he sat in a chair and he wore compression socks, but they did not solve the problem.  R. 75.  Gorman had swelling in his legs if he sat in a chair or stood "a lot."  He took "water pills" when he had swelling.  R. 76.  Gorman said he could not perform a job where he had to sit because of the problem with swelling in his legs.  R. 83.

Vocational expert Hammond testified.  The ALJ asked Hammond the following hypothetical question:

> I'd like you to assume an individual the same age, education and experience as the claimant. This individual is limited to medium work. Limited to occasional climbing of ramps, stairs and ladders. Limited to no climbing of ropes and scaffolds.

Limited to occasional kneeling, crouching, and crawling. Needs
to avoid concentrated exposure to unprotected heights and
unprotected moving machinery. How would these restrictions
affect the performance of the claimant's past relevant work?

R. 87.  Hammond opined that the person could not perform Gorman's past

relevant work.  Hammond said that the person could perform other jobs.

Hammond listed the representative jobs of laundry worker II with 131,000

such jobs in the national economy, hand packager with 250,000 such jobs

in the national economy, and food service worker with 180,000 such jobs in

the national economy. R. 87-88.

The ALJ asked Hammond if the person could work if he was limited

to light work.  Hammond opined that the person could perform a bench

assembly job with 136,000 such jobs in the national economy, assembler II

job with 131,000 such jobs in the national economy, and press operator

with 127,000 such jobs in the national economy.  R. 89.

The ALJ asked Hammond to assume further that the person was

limited to frequent handling and fingering bilaterally.  Hammond stated that

the person could perform the press operator job previously identified, a

sorter job with 89,000 such jobs in the national economy, and injection

molder with 121,000 such jobs in the national economy.  R. 90.

If the person was limited to sedentary work and frequent handling and

fingering, Hammond said the person could perform the representative jobs

of laminator with 110,000 such jobs in the national economy, sealer with

105,000 such jobs in the national economy, and semi-conductor bonder,

with 100,000 such jobs in the national economy.  R. 90-91.  Hammond said

the person could not work if he was limited to occasional handling and

fingering.  R. 91.

Hammond further opined that if the person was limited to standing no

more than six hours and sitting no more than two hours in an eight-hour

workday, he could still perform a limited number of bench assembly and

assembler II jobs at the light exertional level.  R. 92.  The hearing

concluded.

## THE DECISION OF THE ALJ

On June 20, 2019, the ALJ issued his decision.  R. 15-49.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education, and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Gorman met his burden at Steps 1 and 2.  He had not engaged in substantial gainful activity since the Onset Date, and he had

the severe impairments of small fiber neuropathy and chronic kidney

disease with history of kidney transplant.  R. 17.  The ALJ found at Step 3

that Gorman's impairments or combination of impairments did not meet or

equal a Listing.

Before proceeding to Step 4, the ALJ found that Gorman had the

following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR § 404.1567(b) except
> no more than occasional climbing of ramps, stairs, and ladders,
> kneeling, crouching, and crawling; no climbing of ropes or
> scaffolds; no more than frequent handling and fingering
> bilaterally; and no concentrated exposure to unprotected
> heights or unprotected moving machinery.

R. 29.   The ALJ relied on the medical examinations that found normal

strength and range of motion, Dr. Chapa's examination that found the

ability to perform fine and gross manipulations, and Gorman's description

of his daily activities in the medical records and in his Function Report.  The

ALJ also partially relied on the opinions of Drs. Scheibler-Ventress,

Bilinsky, and Kenney.  R. 29-47.

The ALJ found that Dr. Scheibler-Ventress' opinions were only

partially persuasive because only some of her opinions were consistent

with the evidence in the record.  The ALJ rejected her opinion that Gorman

could not lift any amount frequently because she provided no rationale for

the opinion and none of her records showed such a limitation.  The ALJ

also found in her opinion that Gorman could only stand for an hour and

walk for an hour was unsupported by the records. R. 42-43.

The ALJ did not follow the opinions of the doctors on Gorman's ability

to handle and finger.  Dr. Bilinsky found no restrictions on these abilities,

and Drs. Scheibler-Ventress and Kenney found that Gorman was limited to

occasional handling and fingering.  The ALJ found that Gorman was limited

to frequently handling and fingering.  The term "occasionally" means the

person can perform the activity for up to a third of an eight-hour workday,

and the "frequently" means that the person can perform the activity for up

to two-thirds of an eight-hour workday.  See e.g., R. 104.  The ALJ found

that Gorman could frequently perform fingering and handling based on his

activities in which he used his hands such as laundry, sweeping, shopping,

driving a car, and operating a riding lawn mower; Dr. Chapa's examination

finding that Gorman could perform fine and gross manipulations; other

medical examinations that found normal strength including normal grip

strength; other examinations that found no tremor in his hands; other

examination notes that noted only a mild tremor; and Gorman's decision to

buy a wheel chair which indicated an apparent ability to maneuver and

propel the wheel chair with his hands and arms.  R. 46-47.

The ALJ found that Gorman's testimony regarding his limitations were inconsistent with the other evidence in the record. The ALJ relied on evidence that Gorman often rated his pain at a relatively low level of 3/10 and his activities listed on his Function Report. The ALJ discounted Gorman's testimony that he could not sit for extended periods due to leg swelling because Dr. Scheibler-Ventress opined that he could sit for six hours in an eight-hour workday. R. 45.

The ALJ found at Step 4 that Gorman could not go back to his prior work as a maintenance/ stationary engineer at the power plant. The ALJ relied on the RFC finding and the opinions of vocational expert Hammond.

The ALJ found at Step 5 that Gorman could perform a significant number of jobs that existed in the national economy. The ALJ relied on the RFC finding; the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2; and the opinions of vocational expert Hammond. The ALJ concluded that Gorman was not disabled. R. 47-48.

Gorman appealed the ALJ's decision administratively. On May 19, 2020, the Appeals Council denied Gorman's request for review. The decision of the ALJ then became the final decision of the Defendant Acting Commissioner. R. 1. Gorman then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The ALJ's RFC finding was supported by the imaging and EMG/nerve conduction studies; the examination notes that found normal strength and range of motion; Dr. Chapa's examination that found normal strength, normal range of motion, and the ability to perform gross and fine manipulations; the opinions of Drs. Bilinsky and Kenne; the opinions of Dr. Scheibler-Ventress regarding his ability to sit for six hours and his postural limitations; and Gorman's reported activities in the examination notes and in his Function Report.

Gorman argues that the ALJ erred in finding that he could frequently handle and finger.  The Court disagrees.   As discussed above, the ALJ cited the material evidence in the record and explained why he concluded Gorman could engage in these activities frequently.  The evidence cited by the ALJ constituted substantial evidence to support his opinion.  The arguments to the contrary are not persuasive and only invite the Court to reweigh the evidence, which the Court cannot do.  Jens, 347 F.3d at 212.

Gorman argues that the ALJ did not give sufficient weight to Gorman's statements about the debilitating effects of his symptoms.  The ALJ must consider Gorman's statements and determine whether the statements were consistent with other evidence in the record,

> If an individual's statements about the intensity, persistence,
> and limiting effects of symptoms are consistent with the
> objective medical evidence and the other evidence of record,
> we will determine that the individual's symptoms are more likely
> to reduce his or her capacities to perform work-related activities
> for an adult ....  In contrast, if an individual's statements about
> the intensity, persistence, and limiting effects of symptoms are
> inconsistent with the objective medical evidence and the other
> evidence, we will determine that the individual's symptoms are
> less likely to reduce his or her capacities to perform work-
> related activities ….

SSR16-3p, 2017 WL 5180304, at *8.  Here, the ALJ extensively examined

Gorman's statements, the medical record, and the other evidence in the

record and concluded Gorman was limited to a reduced range of light work

but was not as limited as Gorman described in his statements.  The ALJ's

evaluation of Gorman's statements in light of the other evidence in the

records was supported by substantial evidence.  Gorman's arguments

again invite the Court to reweigh the evidence.

Gorman argues that the ALJ erred in his evaluation of the medical

opinions on Gorman's ability to finger and handle.  The ALJ did not adopt

any medical opinion on this issue.  Dr. Bilinsky found no limitation in

fingering and handling, and Drs. Scheibler-Ventress and Kenney found that

Gorman was limited to occasional fingering and handling.  The ALJ looked

at the evidence and concluded the degree of limitation lay between the two

opinions at frequently fingering and handling.  Gorman argues that the ALJ

should have followed the opinions of Drs. Scheibler-Ventress and Kenney because they were based on more recent evidence and were more consistent with the medical evidence.  Gorman also argues that the ALJ erred by not discussing all of the factors listed in the regulations for evaluating medical opinions.  See 20 C.F.R. § 404.1520c(c).

Gorman's arguments are not persuasive.  When evaluating medical opinions, the ALJ must explain his consideration of the factors of the supportability and consistency of medical opinions.  20 C.F.R. § 404.1529c(b)(2).  The ALJ did so.  The ALJ is not required to discuss other regulatory factors.  Id.  Here, the ALJ extensively cited the evidence in the record and explained his analysis of the consistency and supportability of Drs. Scheibler-Ventress and Kenney's opinions on the degree of Gorman's limitation in the use of his hands.  The ALJ also did not rely on Dr. Bilinsky's older opinion over theirs.  The ALJ rejected Dr. Bilinsky's conclusion that Gorman had no limitation on the use of his hands.  The ALJ explained why the evidence showed that Gorman was limited in the use of his hands, but not as limited as found by Drs. Scheibler-Ventress and Kenney.  The ALJ followed the regulations, and his conclusion was supported by substantial evidence.

Gorman argues that he was entitled to a finding of substantial credibility because he had a good work record.  He worked full-time for the power plant from 2000 until the Onset Date.  Gorman cites Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015), to support this proposition.  The Seventh Circuit subsequently discussed the Hill opinion's comment on work history and credibility.  Loveless v. Colvin, 810 F.3d 502, 508 (7th Cir. 2016).  The Seventh Circuit explained in Loveless that work history was just one factor among many.  Furthermore, the Social Security Administration in March 2016 directed adjudicators to stop determining the credibility of claimants based on their character or truthfulness.  SSR 16-3p, 2017 WL 5180304, at *11.  The ALJs are only to determine whether the claimant's statements are consistent with the other evidence in the record.  The ALJ followed SSR 16-3p.  The ALJ determined the extent to which Gorman's statements were consistent with the other evidence in the record and did not make a credibility finding.  There was no error.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 17) should be ALLOWED; Plaintiff Joseph Gorman's Motion for Summary Judgment (d/e 12) should be DENIED; and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See Local Rule 72.2.

ENTER:   January 13, 2022

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE